Case No. 25-5302, Media Matters for America v. FTC on appellants. Mr. Byron for the appellants and Mrs. Lemanski for the appellants. Good morning. Good morning, Your Honor. May it please the Court, Thomas Byron for the Federal Trade Commission. I'd like to reserve three minutes for rebuttal, please. The District Court's preliminary injunction in this case creates a roadmap for prematurely halting investigations by federal agencies. It does so by combining two legal errors. First, the Court disregarded the comprehensive statutory scheme in the FTC Act that provides for channeling and streamlining challenges to CIDs to an enforcement proceeding brought by the Commission and District Court. Second, the Court failed to apply the rigorous standard for First Amendment retaliation claims. The combination of those two errors has created the first injunction against a federal agency's enforcement of a CID, and this Court should decline the invitation to be the first court of appeals to create a precedential opinion affirming that path. This case is at the intersection of two well-settled lines of doctrine that seem to cut in opposite direction. One is, as you say, the hundred years of cases saying you don't enjoin interlocutory subpoenas and CIDs and such. The other is 50 or 60 years of First Amendment law, bantam books, saying that interim chill is a serious thing. It can be an irreparable injury, and that was reflected in the decision of this Court on, I think it was the Texas CID. So how do we reconcile those? First Judge Katsas, I think you're right that this case should start with the hundred-year precedent that says FDC CIDs, like CIDs and subpoenas of other federal agencies, should not be disrupted at the pre-enforcement stage. The question about irreparable injury, which I think is what the plaintiff hangs its hat on here, as you suggest, irreparable injury from a chilling effect on reporting or other First Amendment activity. Irreparable injury by itself is not enough to overcome the Thunder Basin claim channeling scheme reflected in the FTC Act. I mean, Thunder Basin itself excludes from channeling claims for which there's no meaningful judicial review. That's right, Judge Katsas, but that has never been applied to a bare claim of First Amendment retaliation in the investigation context, nor has it been applied to a chilling injury alone. So Axon, of course, is the exception that proves that rule articulated in Thunder Basin, but Axon was very clear that it- a lot of areas of law under which the First Amendment is different. To be sure, but there's no suggestion that the First Amendment-that there's a First Amendment exception for journalism, for speech generally, with respect to subpoenas or CIDs. The Bransford v. Hayes decision by the Supreme Court, I think, is a good demonstration of that. That, of course, is about grand jury subpoenas, right, grand jury testimony. And the court there held categorically that there is no First Amendment exception, no exception for the press from having to give evidence to a grand jury. The same is true, the Supreme Court in Morton Salt made clear- I mean, sure, there's no special media community that's very different from saying First Amendment retaliation just gets treated like any other, you know, cost of doing business with the government, which ordinarily makes you go through the enforcement proceeding. So I think that hinges in part on the second part of our argument, which, of course, is the problem with the district court's First Amendment retaliation analysis. And I'm happy to turn to that if you'd like. But on the threshold- On the threshold question- Irreparable injury and yet meaningful judicial review on the back end. No, I don't think it's tough merely because of irreparable injury. And I think Axon and Thunder Basin themselves both explain why. Irreparable injury is presumed in the claim channeling framework, right? It would only matter if there's something unique about the irreparable injury. Axon says- Injury is presumed. Well, no, the court said- I'm not sure irreparable. The court said onerous injury, right? And I think- Well, onerous injury is a big injury. It's not an irreparable injury. To be sure, Your Honor- Clarify, clarify. Sorry? Just clarify. No, I think that's right. I do think it's fair to say, though, that the court presumes that there will be meaningful, significant injury. And whether it's characterized as irreparable, I don't think is itself sufficient. Irreparable constitutional injury? I don't think that's- I mean, normally the rule is- I'm sorry. Go ahead. Normally, you know, the rule is we assume there's some judicial review of agency action that inflicts constitutional harm, let alone irreparable and immediate constitutional harms. And you talked about this being sort of a first case. Can you point me to any channeling case where there was irreparable constitutional injury and no opportunity for judicial review at all? First of all, Your Honor, I think I want to emphasize there is opportunity for judicial review. No, not if you choose not to enforce, which you haven't for a couple years now. So it seems a little unusual, you are accurate, but to put the control over whether there's judicial review and the very defendants that is charged and assumed at this stage of the inquiry to have inflicted irreparable constitutional injury. Judge Moyet, that cannot be assumed. That must be proved for purposes of a preliminary injunction. The evidence, as we've shown, is not sufficient. We've got fair findings here, but to answer- please answer my question. No, Your Honor. At this point. Yes. There's never been a case. No, but this is not such a case either, and let me explain why. So this would be a case of first precedent for us to hold as well, that the government can inflict irreparable constitutional injury, as the district court found, and then channel them into nowhere.  Unless the government chooses to open the door. Correct? That's your position. That is based on what the district court said, which we disagree with strongly. I absolutely get that.  But for purposes of this question, which is a jurisdictional question, to assume they're right, and the fact findings are right, I'm correct that your position is. You should hold for the first time that I can think that irreparable constitutional injury, and the constitutional injury here is to free speech, cannot be reviewed by courts. That's somehow what we're supposed to discern from the statutory scheme. That's what Congress required without having said so expressly. It cannot be reviewed in a pre-enforcement posture, Your Honor. And there are good reasons for that. When you call it a pre-enforcement posture, you mean it cannot be reviewed unless the government chooses. Unless the government chooses to go to court. Yes, and there are good reasons for that. Let me explain why. Good reasons for that for irreparable constitutional injury. Yes, for constitutional injuries generally, whether they are First Amendment or not. Irreparable ones. I think that's right, Your Honor. I don't think there's a distinction to be drawn here, and I think Axon explains why. But let me put this in terms of the injury that the plaintiff. It would license the government to engage. I'm taking your factual disputes here, but let's hypothesize going forward. It would license the government to engage in rampant constitutional violations of speech. No, Your Honor. It would, because no one can ever take it to court. Here's why. The injury that the plaintiff asserts here is no different from the injuries identified by other recipients of CIDs over the years. They claim that it's irreparable. They claim that it's First Amendment-based. But, in fact, it amounts to a change of behavior upon receipt of notice of investigation. No. Look, I think we're bound by Paxton, which recognizes the exact injury asserted here by the exact defendant. At a minimum, others refusing to associate with them is distinct. They can't control that. Others refusing to talk to their reporters. They can't control that. Put aside the injuries of intruding on editorial and journalistic processes and sources. Judge Millett, they did control that. These CIDs. Other people choosing not to speak with them under fear that whatever they say is going to be swept up by the government CID. Your Honor, a CID is non-public information. The FTC does not disclose. Or to the government. The existence of a CID, Your Honor, is non-public information. Just to take an example, we have issued. Just to be clear, is the motion to quash? I didn't think that was under seal. The motion to quash is not. The decision. Neither the decision and once the decision is issued, the petition itself as well are both public. Okay. There's no secret about this. However, until that petition is filed, it is non-public. They chose to make this public on their own. So, it is not due to the FTC. Let me just give another example. There are 17 outstanding CIDs issued in the course of this serious investigation into collusive behavior in violation of the antitrust laws. This is not just CID issued to meeting matters alone like in Paxton or in Bailey. This is an ongoing investigation by the FTC of advertising boycotts. The question here in terms of whether the CID was properly issued turns on whether media matters may reasonably have relevant evidence to that investigation. It's not about whether we are investigating media matters. Is filing a petition to quash, in your view, part of the exhaustion process they're supposed to go through? Yes, Your Honor. Okay. So, nothing is going to be kept secret. I think that's right eventually, right? But this is about harm that was asserted before the FTC's decision on the petition to quash, shortly after, in fact, the filing of the petition. But you said that the petition itself is a public document. It is now, yes, Your Honor. So, what's your point? Our point, Your Honor, is that the recipient of CID need do nothing. There is no legal penalty to refusing to comply until the FTC goes to court, right? So, you're saying that they could have chosen not to file a petition to quash and no one would even know that they had the CID? That's correct, Judge Wilkins. But then, when you went to court to enforce it, you would say that you win because they failed to exhaust because they didn't file a petition to quash. We might argue that, Your Honor. You would certainly argue that. That has certainly been held with respect to the— Your position doesn't make any sense. I think it does, Judge Wilkins. Here's why. First of all, whether exhaustion requirement applies to a particular argument or not is, of course, going to be decided by the district court in the first instance, right? That's the judicial review that's available. If the petitioner—I'm sorry, if the recipient of CID believes that a CID was improperly issued, was in retaliation, was somehow outside the scope of the agency's authority, they can raise those claims. They might argue exhaustion is not required. A district court could well conclude that, right? The exhaustion questions have not necessarily addressed those specific arguments. We say they should exhaust, of course. But that's to be decided by a court. So we're supposed to—so we're supposed to find that this is self-inflicted because no one would have known about the CID if they had just done nothing. And no one would know, I guess, until the commission filed an action for enforcement in the district court. And they should kind of sit on their hands and hope that a non-exhaustion argument will prevail in the district court, that they won't lose on that grounds. Your Honor, they could make any number of arguments in district court. Hang on, I want to clarify that.  Because— I'm sorry? They don't exhaust. Yes. Because you argue and your brief is required. Yes, we do. And then you enforce. Yes. Unless a court says, yeah, there's an exhaustion requirement. Are they then foreclosed from raising any arguments in defense? That would be up to the district court to conclude. Come on, what is the government's position? Debate partner, Your Honor? It's your position in this case. Our position in this case is that exhaustion is required generally, to be sure. Our position is also jeopardizing a potentially plausible exhaustion argument with this very tough threshold self-infliction point. Well, Your Honor— We don't want to do that. Let me turn back to why we think the scheme as a whole makes sense and the injuries asserted here do not take it out. I want to make sure I'm absolutely clear. If you win on exhaustion, your theory of exhaustion, as you have advanced here— In the district court. In the district court under your theory. Yes. Are they then foreclosed from defending against the CID on any ground? Because there's some jurisdictional thing. If we win on exhaustion with respect to a particular ground, yes, Your Honor. Again, exhaustion— Okay, so if you want to keep secret, that's fine. But then if we choose to—we would love that. You guys stay secret, and then we're going to go choose to enforce, and you have no defenses at all. No, Your Honor. I don't think that's accurate. So what the courts have said in all of the pre-enforcement challenges that have been rejected over the last hundred years is that a CID recipient suffers no legal penalty until a district court in an enforcement proceeding— No one said it in the context of your exhaustion argument, where you don't get to penalize them until you go to enforce. And then if they chose to keep quiet and silent about this, they have no defense. And then you get full enforcement. Your Honor, again— I'm not hearing you say what's wrong about what I've said. I wouldn't say there's anything wrong. I would say it's subject to the district court's— I said, well, there's nothing to review if there's nothing exhausted. That's the whole point of exhaustion. You didn't argue it. You don't get to raise it now. But that's what the district court has to decide. Right. That was the assumption that I said we're assuming that they ruled for you on exhaustion, as you've argued here. To be sure, Your Honor. The scheme, though, makes sense for the following reasons. First of all, there's no legal penalty. There's no irreparable constitutional First Amendment injury here that we're talking about this. Yes, but, Judge Millett, the particular injuries that have been alleged here are not meaningfully different from the injuries that any CID recipient would experience from the effects of notice of an investigation, whether by a federal agency, a grand jury, or anyone else in the federal scheme. The existence of that eventual review is what matters. Now, let me also emphasize that the court's rejecting— In the record that CIDs have been issued are one as broad, cover as big a time period as this, and everybody who gets one and does this exhaustion process you say is required is self-inflicting injuries. Your Honor, the record alone, of course, doesn't include evidence of other FTC CIDs, but we have pointed to several cases over many years, over a decade, that include CID enforcement cases that show— If you can point me to the case that said, and here's the information that was requested, and includes all these categories here, and I think it was six years backwards they were supposed to go in this one? Yes. Which case is that? So we cited several cases in the footnote in our reply brief, which I'm happy to point to. And they all describe the content of the CID just— They do, Your Honor. And let me also emphasize that two— Includes editorial processes. Well, no, Your Honor. Includes journalist notes. But neither does this CID include editorial processes for journalists. It definitely asks for editorial processes, and it definitely asks for information acquired by journalists, and how you decide what you decide to publish. No, Your Honor, that is their interpretation of it. We have said in the meet-and-confer that's explained in the record in this case that we are open to discussions about the scope of the CID. That is routine. That's part of the administrative process. Did you change these? Are there things that have been scratched out on the CID? No, Your Honor, because they cut those short and filed a petition to Gouache and brought this case the next day. How long of a discussion do you need to say, oh, no, we don't mean to get into your editorial processes, or anything, any journalistic notes, information from journalists, any of their sources? How long does that take? Well, Your Honor— There were a couple rounds of meet-and-confer. There were, I believe, two, Your Honor. Okay. How long—why wasn't it said then? Because the meet-and-confer process ordinarily continues. The FTC staff— That's not an answer to my question. How long does it take you to say, oh, I'm sorry, you're reading this to say— because they were serving First Amendment to you then, right then and there, right? The First Amendment infringement case, right then and there. They raised the First Amendment. And then you say we need to keep talking for three, four, five rounds before we can get around to saying you misunderstand the scope of this. Your Honor, yes, because here's how the process works. This is an administrative process, as Thunder Basin schemes often contemplate, that goes for a period during which there is an ongoing back-and-forth between the agency and the private entity. Here, that process includes all of the steps up until— Why don't you tell them right up front? Because there was—I don't recall the exact detail. There was one thing you all modified during the meet-and-confer process. We modified the rationale, the explanation of justification for the investigation, offering more detail. You had time to do that. We did that. You didn't have time to say— Your Honor— I understand you've raised the First Amendment—you're raising First Amendment concerns, but you didn't get around to saying this. They're supposed to keep coming and coming and coming and coming. Two things, Judge Mullett. First of all, we did that in response to the petition to Quash, which raised that objection, and that's the ordinary course. You did what in response to the petition? Added additional detail, Your Honor, to the explanation of the scope of the investigation. And just as you did that, you could have said, well, we don't really want to intrude on your editorial prerogatives or get names of sources, et cetera, right? You could have used the opposition or response to the petition to Quash to clarify what it was that you were really seeking. I mean, that happens all the time. So the legal objection they raised in the petition to Quash, Judge Wilkins, based on the First Amendment, was not specifically about those editorial sources or that aspect of the scope. They said they were entitled to a journalist privilege, right? And we explained in the petition to Quash why that doesn't apply. As this court has held, it doesn't apply in a grand jury. Morton Salt says the FTC's investigatory scope is like that of a grand jury, and that was the reason why we rejected that argument. If they had continued with the meet and confer, we could have sought to narrow the scope of the specific terms. But let me also explain why the ongoing process is important, and it continues up until the time if the FTC decides to seek to bring a CID enforcement action. That whole process is important because the FTC might well decide to seek only a narrower subset of the documents specified in the CID itself. The district court was concerned about the scope of the CID, for example. That concern was misplaced because, as we've seen in other cases, including other cases brought by— You're telling the district court we're not asking for the things that they're troubled about and that you're troubled about, Your Honor? We have not reached that determination yet, Your Honor. The process— You're debating, you're having these findings for a preliminary injunction, and you're saying, what are you guys worried about? Wouldn't that have been a really good time, at least finally, after you've had multiple meet and confers and a petition to Quash? You've had plenty of time to think about this. It would be a good time to say, no, Your Honor, I'm here to represent. We don't want that. My whole point is that the administrative process continues up until the point that the FTC brings the CID enforcement action. That's the time. That's the statute of contemplation. So you're sitting there in front of the district court— I don't know if it was you personally, but your attorneys are sitting there in front of the district court laughing up their sleeves. They don't know how to read this thing. That's not what it's asking for. That's totally inappropriate. If that's not what you were going after when they were asserting their concerns and their injuries, that would have been a good time to say something. I guess you want your administrative process, but once you're in court, if someone's misunderstanding the scope of the CID, it's a lot of burden on you to clarify at that point. That's good government. I disagree, Judge Millett. That's not good government to be clarifying before the court? What's good government is what the FTC Act establishes as the framework for streamlining and channeling. Are you suggesting we should be clarifying confusion before a district court? This is not about confusion, Your Honor. It is about confusion. I've read this thing, and I read it. I have read it to cover editorial prophecy and information journalists have. And so what is so wrong about the district court did the same thing? That's what the administrative process is for. Well, the administrative process has been interrupted because there are concerns about serious First Amendment injuries here. And the FTC's position is that's a misunderstanding and a misreading of the CID. And I thought that's what you were – no, now I'm getting – sorry. Clarify now. We are not here to assert the scope of the CID is narrower than they say. We are here to point out that the administrative process is there to – So you agree that the CID itself asks for – I misunderstood. You said it wasn't asking for – It has been read by plaintiffs to be that broad. Do you agree or disagree with that reading? We do not here take a position on whether it would reach those materials. The only way we can take a position, the only way the statute allows us to take a position is in a CID enforcement proceeding. If we were to bring such an enforcement proceeding – Does the statute forbid you from taking that position in a two-meeting conferred or a decision on a petition to quash or in a hearing before a district court judge? No. Where does the statute say that? We can modify the CID. The regulations specify that. The rules specify – It doesn't say the only place you can do that. But there is no provision for pre-enforcement challenges in an injunction. That's a very different argument than what you are telling me right now is that I thought I heard you say, and correct me, that our hands are tied. The only place we could modify this to address those concerns is back before the agency. I thought you said the statute says that's the only place. The statute creates a scheme, a comprehensive scheme. That's not my question. That was my point, Your Honor, if I may clarify if I misspoke. I apologize. I get your understanding of the statutory scheme. I thought you said that's what then prevented you from saying to the district court, either they're misreading it or we can see this is a concern. If the court will allow us some time, we'll meet and confer with them some more and see if we can resolve this. Could you do that? I don't know, Your Honor. You don't know? My understanding, I think it would be inconsistent with the statutory scheme. That's the point I was making. Then I'm back to what you're saying. You're saying somehow the statutory scheme prevents you from saying, excuse me, Your Honor, we understand their concerns better now. Okay? We're going, let us go. We'll meet with them. We'll have some meetings outside the courtroom. We think we can resolve their First Amendment concerns. And your position, I think you're saying, is we can't do that. No, Your Honor. Our position is the court can't. They can't come to court to seek that relief. They must proceed. They must proceed. You could, though, have clarified to the district courts if you think that either the CID captures First Amendment protected communications or it doesn't. On its face, to me, it reads as though it does, as it did for the district court. It seems to be a factual question, not a legal one. And your position is you couldn't tell, answer that question to the district court. Not in a pre-enforcement injunction proceeding, Your Honor. That's correct. That's the statutory scheme. So you're saying that when a pre-enforcement challenge is made by a recipient of a civil investigatory demand, the FTC can't say to the district court that the plaintiff has misconstrued the language of the CID, and it doesn't really have the vast scope that the plaintiff alleges in their complaint, that the FTC can't do that? We think the Thunder Basin framework means that that's not an appropriate place for the FTC to make that point. That's not my question. My question is, once that challenge has been made, and a court in the context of that challenge asks the agency, just so I understand the CID, does it include X, Y, and Z? You're saying the government can't respond to that and say, no, it really doesn't include X, Y, and Z. Its scope is different. You're saying the government can't do that? No, Judge Wilkins. I'm not saying we're precluded, barred by the statute in any way from doing that. What I'm saying is that the statutory scheme means that's not an appropriate inquiry for the court. It's not an appropriate proceeding to determine the scope of the CID. The CID enforcement proceeding is what the statute contemplates as the posture and the appropriate stage to make those determinations. District courts in CID enforcement proceedings make those determinations all the time, Judge Wilkins, in the scope and question of burden, question of scope, question of relevance. All of those determinations are precisely why the FTC Act channels and streamlines those kinds of claims. And so what if the agency never brings the CID enforcement action? If I may, Your Honor, not to be glib, but that's a feature, not a bug. And that's what the courts in general finance, in Blue Ribbon, have made clear, that that's frequently true. And one of the reasons why it might be true in a particular instance is that the FTC is able, by issuing CIDs to other entities as well, for example, we did that here, at least 17 CIDs were issued in the course of this investigation, might be able to obtain the information it needs from other sources. In that event, there's no need to enforce the subpoena. There is no need to subject the recipient to legal penalty on pain of compulsion in district court. That is what the statute, again, contemplates. And it does so by reducing the burden on a recipient of a CID. The district court here misunderstood that as somehow creating additional burdens. That's inconsistent, again, with that centennial view. Do you ever notify a recipient when you're no, you don't intend to enforce it? I don't know for sure, Your Honor, if there's, I know there is no public notification. There may be an informal communication. You don't know if there's a, I'm sorry, there may be as in could happen or not randomly, or there is a process or not. The FTC staff could certainly inform the recipient.  I don't have any information about that. You don't know if they've ever done that. I believe they have in some circumstances, but again, it's not public.  I'm sorry, Your Honor? What kind of circumstances? I do not know. So it seems like if someone is compelled to come and expose the fact of the CID on pain of losing all defenses under your exhaustion theory. So now everyone knows and nobody wants to talk to them. And then they just sit there with this sort of damocles hanging over their head. And the government may or may not ever tell them that it's not going to enforce it. Well, Your Honor, they can certainly continue to consult with staff and the staff will engage in that administrative process. No hope to them for their injuries. It may well be, as I said, for example, if the investigation concludes by charging the targets of the investigation, which again may not include all the recipients of the CID. Those CID recipients. You don't know if you've gone after everybody for which they've sought information. You've sought information from them. Your Honor, the investigative process is a cooperative one. We made that clear. The regulations make that clear. It's intended to encourage informal communications between the CID recipient and FTC staff. FTC staff are always available to discuss the scope of the CID, the need for the information. But otherwise there's no guarantee that they would get notified or even a process for them to get notified. It could sit there open for years and years and years. There's no public process, Your Honor. But again, it's that informal cooperative process. Not even an informal process that you have any details on or any sense of regularity about other than, okay, maybe occasionally, randomly someone's been told. Your Honor, again, there's just no public notification. There's ongoing information. You're not telling me here that there is a regular process for private notification. But there's that opportunity and encouragement even for ongoing communication with staff.  I think it is, Your Honor. Unless staff is going to say, don't bother. Well, when it comes to – And the informal staff can speak for the entire commission in that regard and say they're not going to enforce the CID. Staff, yes, Your Honor. We pointed to the regulatory provisions that explain that staff does have authority to modify the CID. No, no, no, no. That's not what I said. Does staff have the authority to disclose to them that, don't worry, the commission's never going to enforce this against you? The staff can certainly – has the authority in modifying the CID to make representations that – I'm asking not about modification. I'm asking, does the staff have the authority to say, tomorrow if they wanted to, to Media Matters, don't worry, the commission isn't going to ever enforce this against you? Yes, Your Honor. The staff does have the authority to withdraw a CID. They have to formally withdraw it? There's no formal process, but it can be withdrawn, Your Honor. What does a withdrawal look like? It would, again, be a communication from the FTC staff to the recipient. Did they get any protective record of this? They would presumably receive a letter. That's the ordinary way staff communicates modifications of the CID or – indeed. Or decisions on behalf of the commission that it shall never reinforce. Well, it would need to be withdrawn, Your Honor, but it could be. Does that get run off through the commissioners? I don't know the answer to that, Your Honor. I would need to – That's like a pretty big decision for a staff to make. I would need to consult, Your Honor. But let me turn – let me just emphasize again, Judge Wilkins, in response to your question, that there are many CIDs issued that are never subject to a CID enforcement action. And, again, the case law in this area, rejecting pre-enforcement challenges, views that as a positive feature of the statutory scheme by reducing interference in the process that otherwise would slow the investigation. I get all of that, and there's some force to that. But what about the fact that there is a finding that there is a First Amendment killing and that that's irreparable harm and that it's in the context of retaliatory action and that the agency would be perfectly content with having that harm continue indefinitely and the way that it can do so is to just never bring an enforcement action? Judge Wilkins, I want to step back for a moment because I do want to emphasize, and I hope we'll have time to get to this, why this is not retaliatory action. And the plaintiffs have not met the standard for First Amendment retaliation. This is a serious investigation into collusive conduct and violation of the antitrust laws concerning advertising boycotts. This is not an investigation of Media Matters alone. This is not necessarily an investigation of Media Matters as a target at all. The question is whether Media Matters has relevant information to that antitrust investigation. In that respect, they are- What's the standard of review of those findings by the district court? A specific fact finding is subject to clear error review. However, whether the facts as a whole satisfy the legal standard is subject to de novo review, Judge Wilkins. And that's what we've taken issue with. Here, the facts do not meet the standard because the FTC has explained in its public statements, in the petition to Quash, in the Omnicom IPG order and accompanying statement of Chairman Ferguson, why this is a matter of serious concern for the antitrust enforcement operations of the commission. That alone is the alternative explanation that is called for, right, and that was not made in Bailey or Paxton, that is in the ordinary course in retaliation claim, what requires then a showing of but-for clause. And here they cannot meet that. The CIDs would have been issued to all of the recipients, including Media Matters, because they all have reasonably relevant information about advertising boycotts in violation of the antitrust clause. That's the relevant standard, the legal standard for issuing the CID. And because, as the Supreme Court in Neves and many other cases, and Hartman has said, the state of mind of a decision maker is easy to allege but hard to disprove. For that reason, the but-for causation standard requires this court, and the district court's findings do not meet this standard, to show that but-for the alleged retaliation, the CID would not have been issued to Media Matters. Plaintiffs cannot meet that showing. And, in fact, they backed away from that. They originally brought this claim and the district court accepted it on the basis of a theory that a November 2023 article that Media Matters published sparked retaliation by two state attorneys general, a private company, and then three years later, almost three years later, by the Federal Trade Commission, too. That does not hold up to the explanation that we have offered, that this is an antitrust investigation covering at least 17 CID recipients, about a specific target not having anything to do with that 2023 article. In this court, the plaintiff has backed off from that theory. They now say the entire investigation is somehow suspect on the grounds of ideological concerns. But that's not a First Amendment retaliation claim. Arif against Lynch makes clear that a First Amendment retaliation claim has to be based on a particular protected expression under the First Amendment. In that case, it was a claim that the plaintiff had said something during a sermon in a prayer service. The court didn't look at whether the prison guards in that case were somehow ideologically or personally disagreeing with other views more generally about the plaintiff, nor should this court do so here. That's not a First Amendment retaliation claim. That's why the district court's analysis is insufficient, and that's why facts that are alleged do not meet the legal standards, Your Honor. It's not a question of clear error. I think what they're arguing, they can correct me if I'm wrong, is that what put Media Matters in the bullseye was a dare to publish an article that showed, disclosed to the public and affected companies, that Nazi ads, that either their ads were showing up near Nazi articles or Nazi ads were showing up near their articles. They were having Nazi material posted alongside their information. And then they noted that Elon Musk had made a despicably anti-Semitic comment. And that's what put them in the bullseye. And then it turns out it seems to now have exploded into either they've been swept up in some other investigation, but they've been swept up, swept in for one reason and one reason only, or perhaps the entire investigation somehow thinks it is an illegal advertiser boycott to expose Nazi misinformation. No, Judge Millett, this has nothing to do with the 2023 article. They have pointed to no statement. Well, that's what you say, and that's what you say. The district court found the exact causal link you want, and this is an extraordinarily troublesome record of governmental behavior and comments. I have to disagree strongly, Judge Millett. The comments of the decision-maker here, Chairman Ferguson, acting through the commission itself, including Commissioner Holyoke as well, have nothing to do with media matters, have nothing to do with the 2023 article. They are solely about antitrust enforcement. Going after the radical left. I don't know what's radical left about being anti-Nazi. Do you? Your Honor, this is not about anti-Nazi. There's nothing radical left about being anti-Nazi, right? Your Honor, this is not about whether anyone is anti-Nazi. There's nothing radical left about being anti-Nazi. Judge Millett, this is not about being anti-Nazi. That's what you say. It is what Chairman Ferguson said, Your Honor. He said he wanted to go after the radical left and would use advertiser boycotts to do so. And he explained in the commission's decision on the petition to quash and in the Omnicom settlement order and his accompanying statement, what is the antitrust theory here? That by colluding among advertisers, that reduces advertising on certain platforms in violation of the antitrust laws. That is a legitimate subject, a serious concern of antitrust enforcement for the commission. Media matters was swept into that on what basis? Your Honor, they had been in litigation about advertising boycotts brought by X. Brought by X, found to be dismissed. Brought by Texas, found to be First Amendment retaliatory. That was a very different case. Brought by Missouri. Missouri dismissed its own. Those two were very different cases. They've been in litigation. With X, Your Honor, not with Missouri and Texas. Those had nothing to do with advertising boycotts. Those were admittedly retaliatory. He said they've been in litigation. I said they've been in litigation about advertising boycotts with X. That's why the specification in the CID issued to Media Matters asks for documents produced in litigation about advertising boycotts. That was the thermonuclear lawsuit that Elon Musk. I don't know if that's what he was referring to or not. We were concerned. We were concerned. Logical inferences. All we're on here is a preliminary injunction record. All we have is the tentative, more likely than not, determinations on a record. You'll have plenty of opportunity to clear up the record, to dispute these facts, to put them to the very, very difficult burden you've outlined for establishing retaliation, First Amendment retaliation. You will have every opportunity to do that, but we have a clear error standard here of review for preliminary injunction. In fact, clear error compounded by abuse of discretion review. But subject to de novo review for the legal standard, and our point here is that the facts alleged do not satisfy that standard, Judge Millett. The burden at the district court level is serious. The likelihood of success is not minimum. It is a serious inquiry, especially in the context here, where there has never been a court of appeals. It requires a strong likelihood of success, and that would include a strong likelihood of us finding clear error on the factual determinations. I disagree, Judge Millett. I think it's not about clear error at all. I mean, you can accept all of the factual determinations. The point is that they do not satisfy the First Amendment retaliation standard because they do not show but for causation. That's the ultimate question here. And the problem, if I may just to link it back to that history, century-long history of courts rejecting pre-enforcement challenges, is that by setting a very low bar for the plaintiff to meet a retaliation standard, where, after all, government misconduct is easy to allege but hard to disprove, the plaintiff's theory creates a recipe for interfering with federal agency investigations. Only if you have an actual record like this. Well, we thought that too, Your Honor, until we received two more claims by recipients in the same investigation who had nothing to do with Media Matters 2023 reporting, right? And so it's apparent that this recipe is now being viewed by others as a means of substantive. Perhaps they also were anti-Nazi and got sucked in. Perhaps they're the people listed, which we obviously won't name, in the CID here. We don't just know enough information to know whether that's a real problem. Your Honor, our point is that this creates a gaping hole through which plaintiffs, CID recipients, can seek to halt investigations, contrary to a very long line of precedent. Let me conclude if I—sorry, Your Honor. I'm sorry, I just wanted to check. Okay, please do wrap up, though. Okay. I didn't, like, finish your thought that you just said. I just wanted to conclude by saying that the investigation here into advertising boycotts has been ongoing throughout the past year. When we were precluded, and joined, in fact, from bringing an enforcement action, we have continued to seek information from other sources. We are actually in settlement negotiations with targets of this investigation, and we anticipate public announcements on that front very soon. We'll inform the Court, of course, as soon as the Commission takes action in that matter. Thank you, Your Honor. I hope to have a few minutes. I think we've reached a time for everyone, for sure. Thank you. May I begin, Judge Thomas? Yes, please. Okay. Well, good morning. May it please the Court, I'm Thanos Lonsky on behalf of Affiliate Meeting Matters. If I could, I want to make just two very brief points at the outset that I think are directly responsive to what my friend on the other side just noted. First, the District Court had jurisdiction in this case. To accept the government's Thunder Basin arguments, you have to conclude that Congress permitted the retaliating agency to control whether the victim of its retaliation could ever access federal court. There is nothing in the statutory text or precedent that requires that extraordinary and bizarre result.  But there is something to the intuition that nothing can happen to them, nothing can happen to your client unless and until a federal judge signs off. I don't think that's true, Judge Katsas, and I think this Court already explained that in Paxson. I think this is the same argument that was made by the Attorney General in Paxson wrapped up in a new guise. In Paxson, the Attorney General argued the exact same argument my friend on their side is making. There's no harms to you until we enforce it. There's no legal penalty until enforcement. And what this Court said, Judge Millett, as you noted, with the same harms, the same plaintiff in this case, the same victim of retaliation, the Court said no, there are ongoing harms today. Let me highlight those two harms for you. First, as you pointed out, Judge Millett, there are the harms to the pullback of third parties. So third parties are saying we don't want to engage with Media Matters because it's the subject of this coercive investigation and we may get swept up in it. Second, you have the fact that they can't report about the news. They would report about this case, for example. They can't do that. The news is called the news for a reason. It's new. That can't be remedied after the fact. So three, four years down the line, they can't go and report about this case and report about what's happening. That's a quintessential irreparable harm. They're never going to get that back. And so that's why this case is very different from Reisman. It's very different from Claire Furness. You noted, Judge Patsis, at the outset that we have these two strands of precedent. Only one side has given you a way to reconcile that. And by the way, I don't think it's terribly hard because you already did it in Paxton. In Paxton, the Attorney General for Texas said, we think Reisman controls this case. And this court said, no. And it explained that when you have these kind of First Amendment harms, you're outside of the Reisman world and instead you have an irreparable injury. In Reisman, the court goes out of its way to say, in that case, there wasn't an irreparable injury. And if you look at the other cases in the circuit courts, my friend on the other side cited, we gave you two, one from the Tenth, one from the Third Circuit. In those cases, the courts are very clear to say there wasn't any irreparable injury on the facts of those cases. Here you have the irreparable injury that if the government is right, there is no way for media matters to access court unless the retaliating government chooses to permit it. To Judge Millet's point, put aside for a second the facts of this case, which we think are damning, and imagine the worst type of retaliation you can think of. Under the government theory, they can hold that retaliatory CID, causing all of these intended harms, like a sort of Damocles, over the head of the victim, and the victim can't do anything about it. That is an extraordinary conclusion. We would expect to see far more from Congress if it intended that result. But your friend on the other side points out one of the advantages of having a statutory scheme where the enforcement agency initiates court review is that the court then only has to deal with whatever the agency deems important enough to seek enforcement of, so that the court's not giving advisory opinions on the 20 different things that are in the CID, if really the agency only cares about two of them. And so what about that, that when you have these pre-enforcement challenges and the recipient comes in guns blazing and challenging everything, it may be that the agency isn't really willing to really try to get enforcement of 90% of them. So I have several points in response to that, Judge Wilkins. I think it's deeply concerning if the FTC's strategy routinely, and I have sort of responsive other legal points, but just at a top line level, deeply, deeply concerning if the FTC's routine strategy is to issue just extraordinarily broad onerous CIDs and say we're going to basically knuckle you under compliance. I've done enough litigation to see all sorts of broad discovery requests that get, that's an opening salvo and once there's pushback, you know, things get narrowed down. That's the way, unfortunately, our system seems to work. A couple of points on that score, but I do want to answer your question, which is I think at a top line we're just not in the ordinary world because we're in a First Amendment retaliation situation. But to your point, Judge Wilkins, what we're talking about here is an extraordinarily broad CID that is seeking incredibly sensitive information. It's seeking financial records from a nonprofit. This is some of the most sensitive data that you could possibly ask for under NAACP, there's Alabama, under Bonta. We're talking about the heartland of First Amendment protected information that they're calling out directly. It's asking for journalistic notes. So I don't think this is just an ordinary circumstance where they're going to say we're going to pare it back. Then they haven't pared it back. They won't even pare it back in front of you right now. What they've actually said when they would say anything about the CID, and by the way, they're willing to say lots of things about the scope of the CID. They just won't engage with you, Judge Millet, on the substance. They're here to tell you the CID is normal, don't worry about it, and all these other things. But then when you drill down, they won't engage you on the substance. What the one thing I heard my friend on the other side say was that this CID is warranted because it's asking about Elon Musk's retaliatory investigation. So if you want a link to the ongoing retaliation, it's Specification 5. They just told you we're going after them because Elon went after them. That's deeply, deeply concerning. And to your point, Judge Wilkins, we're not asking for an ordinary overbreath challenge. I agree with you that in the Mine Run case where it's a regulated party that is subject to enforcement by the FTC, and by the way, we're not even subject to enforcement. They can't even enforce substantive antitrust law against media matters, which makes the whole thing more bizarre. But to your point, Judge Wilkins, in the ordinary context, yes, in the ordinary context, you don't suffer a harm because you're not dealing with First Amendment retaliation, so you can't get into court. And that's what this court said in Paxton, that there's a difference between the ordinary case where, in fact, you can just wait like a riceman and suffer no injury, and a case like this where there are ongoing harms happening today. But if media matters can't go into a district court and get relief, it can never get that constitutional harm back. And the agency, like a sword of Damocles over its head, right, the agency controls whether that judicial review ever happens. There's nothing in the FTC Act that suggests Congress wanted that extremely bizarre result. If the court has no other questions about jurisdiction. Let's talk about exhaustion for a couple minutes. Sure. So I think, to my friend's exhaustion point, I think there are a couple of arguments. I mean, we feel very strong on the exhaustion point as a legal matter. Let me just start, though, what I think might be the clearest route for this panel, which is forfeiture. If my friends on the other side are saying rules are rules, well, rules are rules, and they're rules for a reason, and they didn't raise it until their opening brief on appeal. They didn't even raise this at the stay stage. And I would note that what my friend said when it came to exhaustion is he said— When the scheme—when the scheme allegedly subject to channeling ultimately directs you to a district court, there's a lot of overlap between the Thunder Basin point and the exhaustion point. Yeah, so— Patton sort of confused us maybe a little bit. So, Judge Katz, I think my friend said, and I may be getting this quote wrong, and I apologize if I am, but I believe he said, as to exhaustion, that quote, of course, that will be decided by the district court in the first instance. Now, that was when he was talking about exhaustion. He didn't want to answer the questions about what the ramifications of exhaustion would be. So, I would take the FTC's turn and get it back down.  Just suppose I'm more worried about exhaustion than self-infliction. Sure. So, a couple of points here. One, we did raise—this was all before the FTC. So, as Judge Millet noted, we did raise the First Amendment argument from the FTC. Their point now is we didn't raise precisely the right one. That's something that the district court should address in the first instance. What did you raise? You raised journalist— We raised the journalistic privilege argument. We didn't raise— Pretty different from First Amendment retaliation. A couple other points. We don't think we had an obligation to exhaust it for futility and bias reasons. We don't think it makes sense to say, right, if Chairman Ferguson is the one deciding it, you've got to go in front of Chairman Ferguson to exhaust your retaliation claim when you said he's the one engaged in retaliation? That's a fair point. But he issued the CID just by himself, as I understand. Right. And the recon would have been decided by— Two members, and if they split— Two members, which is a different dynamic. I mean, the AD Commissioner Holyoke persuades him. Maybe she writes a separate statement that helps frame the issues on judicial review. So all issues that can be fleshed out potentially in the district court, I think we have even further evidence that it would be futile in this case. Just to give you another example, in the NewsGuard case, which my friend on the other side cites, and I will add that FTC's order in NewsGuard is actually unusually not public on their website. You have to go to the NewsGuard district court case to get it. They filed it as a notice of supplemental authority there, so it's not on their website. NewsGuard's petition to Quash is. When you look at the FTC's order, and this just shows the futility, the FTC's order in NewsGuard raises a first-member retaliation claim. The legal portions that say you can't claim first-member retaliation, they're almost word for word. It's brief on appeal here. So we know it's futile because the FTC made the exact same argument. It's almost a copy and paste. They take their brief here, and they put it into the order. So we know it would be futile in NewsGuard. On some level, that's probably true about 99% of motions for reconsideration, and yet— So, Judge Mathis, if I haven't gotten you yet, let me give you one more fact that might get you there. Okay. The FTC cites this litigation in its order about the petition of Quash. Chairman Ferguson, in his opinion, says, oh, yeah, we know they've raised first-member retaliation claims. The whole purpose of exhaustion is to give the agency a fair opportunity to address an issue and change its mind. And the timeline explains what happens here. So Media Matters files its petition to Quash. It's got those ongoing First Amendment harms, and it doesn't want to leave the agency in the driver's seat. So while the petition to Quash is pending, it also goes to the district court. It's very upfront, right? It says, we need relief, so we're filing for a plenary injunction. That means when Chairman Ferguson subsequently decides the petition to Quash, he drops a footnote where he says, yeah, yeah, I know they're raising first-member retaliation claims. So we feel very confident on the law here. We feel very confident on the facts regarding exhaustion. And that's just a good reason why all of this should be addressed in the first instance by the district court. I mean, everything I just gave you, we really haven't had the opportunity to develop and brief. And that's the perfect scenario, which I think my friend on our side agrees, is why this should be in the first instance addressed by the district court. Why not just assume for the sake of argument that the two-member commission is different enough from the chairman by himself to get over that problem? Why isn't it, you know, you've got all these bad statements in the record. Maybe there's ‑‑ maybe this is a motivating factor, but nonetheless the agency feels strongly. Everyone agrees but for cause is a decisive issue. And, you know, maybe there are issues about whether the burden shifts from motivating factor. Maybe the agency wants a chance to explain why they would have brought this CID anyway. It's all sort of bound up in the merits. It's fact intensive. And the scheme seems to require this go to the agency first. I actually would disagree on a couple of those premises, Judge Katsas, that are baked into your question. The first one is the idea that the agency has some unique experience with deciding the law of First Amendment retaliation. I think actually Axon suggests the exact opposite. This is not an area where the agency is particularly skilled at deciding burden shifting questions, for example. Those are the types of questions that go to Article III courts. So baked into your question, I think ‑‑ No, but the agency is the one to make the case that they would have brought this anyway. And I don't think ‑‑ and I think our top line point is a very sensible one. You don't have an obligation to exhaust a retaliation claim before the retaliator. And then we have a futility point. So to spot you that this two‑member, and we would disagree on this, that this two‑member agency is somehow different, which is a factual determination the district court can evaluate. But let's spot you that for a second. We know how these two members address this in the NewsGuard case. They say, we're not going to address this because we don't think, as a legal matter, that the FTC can ever be subject, basically, to a First Amendment retaliation claim. It's the same argument they make in this court that no such claim functionally exists. That's an extraordinary claim. That is a recipe for the worst kind of government abuse imaginable. Pretty broad position. Sometimes litigants and agencies have fallback. I think the fallback position that the United States ‑‑ More plausible. Yeah. I think the fallback position, or not a fallback, I think the top line position of the United States government that it can never be subject ‑‑ I agree with that. Is pretty problematic. Yeah. I agree with that. But they might have a much more attractive position that, you know, there are lots of unfortunate statements and people sometimes say dumb things, but nonetheless, this is an important investigation. But just to the futility point, right, just to make very clear, that's the FTC's official position in their briefing here and also almost word for word in their order in the NewsGuard case. So just to your exhaustion point, it's clearly futile. And all of this, again, has never been briefed. I mean, substantively, this is precisely a situation where you send it back down to the district court and give the parties a fair opportunity to hash out whether exhaustion applies, whether any exceptions applies, and the like. Thank you. Do you want to address their argument that you've abandoned your retaliation for the article? I don't think that that is a fair reading of our brief at all. What we think happened here, and we've been very clear about in our briefing, and what the district court found is that there's a continuous multi-year campaign against Media Matters. What happens is Media Matters, as you pointed out, has the temerity to report about the extraordinarily noxious content on X. Then the world's wealthiest man, Elon Musk, vows that he's going to engage in a thermonuclear campaign of retaliation. You then have the now deputy White House chief of staff, Stephen Miller, sending out the bad signal that every state attorney general who's conservative should go and prosecute Media Matters. You have two state's attorney generals, one for Missouri, one for Texas, that take up the call. Judge Mehta finds that those are clear First Amendment violations. You then have the FTC coming over the top with the same exact tactic against Media Matters. You have the FTC calling out on the face of the CID, and they said in this court that Specification 5 is why they're going after Media Matters. That's the specification that's all about Elon Musk's campaign of harassment. So the FTC comes in with this extraordinarily broad sweeping CID. Just to give you one point, the FTC is asking for financial information from a nonprofit. This is, again, the most sensitive data that you could possibly imagine. They have no coherent justification for why they could possibly need this. They have never provided one, not in the district court, not now. Closest they've come is that, well, maybe they're being paid to coordinate advertiser boycotts. This should all be deeply troubling, and it is indicative of pretext. And that's what the district court found, and that is not a de novo review. That's a clear error review. The district court made a factual finding of retaliation here. That is subject to de novo review. But it's not enough to establish but-for causation as opposed to a motivation. But what the district court found was but-for causation. I don't—this argument that we can somehow look at it and say, well, as a matter of law, that's not enough, is really just asking this court to ignore clear error review. It is to create an ad hoc exception and say, well, I've decided as a court, not as a trier of fact, but somehow as a matter of law, that these facts aren't enough. That's not a de novo legal question. That is a substantive factual question to which the district court is of deference. But let me also add, you have all of the other evidence that the district court relied on. Well, the district court said—I mean, they certainly have said before the district court that this is an investigation into advertiser boycotts. So you've got two motives on your table, get media—punish media matters, your First Amendment retaliation argument, get information about advertiser boycotts. Where—tell me how you think the district court found but-for causation, given that they had that additional explanation. So a couple of points to that, Judge Millett. The first is that, as I think you noted and Judge Wilkins noted in the state panel, they haven't even shown why media matters would be lumped into that. And the only argument they've given in this court is to say, well, you know, that Elon Musk's campaign of retaliation is why we're going after media matters. That should raise, I think, deep concerns and disproves the argument that they somehow would have gone after media matters for another reason. I think Specification 5, the way my friend articulates it, really dooms them here. You then have the fact that the court can look and say this is pretext. And what happened in this case is that you had the FTC originally provide no justification whatsoever, none, zip-up. And then after media matters comes in and files this lawsuit, in response, the FTC files an extremely vague theory. In its briefing, it clarifies and says, well, we're really concerned about the fact that there might be using lists to coordinate ad placement between advertisers. They have no theory for why media matters have any possible information to that very narrow claim associated to lists. But even if you accept all that, there are two more reasons I think you shouldn't accept the argument from my friend on the other side. The first is, if you allow the FTC to basically get away with naked retaliation by saying, well, we're also going after others, you've given a straight roadmap for retaliation. Because what a government agency can do is they can engage in the worst possible retaliation you can imagine and then say, well, we're also going to go after this regulated party, too. And look, it's part of a legitimate investigation. So there's nothing you court can do, even though you have this clear-of-day retaliation, because we've given you that alternative justification. So I think that I wouldn't open that door. I think it's concerning. I know, but they say what you're going to open the door is everyone who doesn't like their CID is going to say you're retaliating against me. You didn't like what I spoke or you didn't like what I said in some speech I gave the week before or something like that. Sure, and I think that there are a couple of responses to that. One is they're not going to have the extraordinary developed factual record we have here, which includes this multi-year long campaign of retaliation and harassment from multiple government actors and the world's wealthiest individual called out on the face of the CID. So I think that it's a fact-specific determination. And then on top of that, Judge Millett, you have the fact that they have to show harm. In the NewsGuard case, which is being briefed right now in the district court, the FTC argues they don't have harm. Media Matters may have had harm, so we disagree with those harms. That's the FTC's language, right? But NewsGuard don't have the same type of irreparable harm. We've also shown the irreparable harm. Both of those things, the factual requirement to show retaliation and the irreparable harm requirement, are going to provide serious checks to the scenario you suggested. The alternative is you open the door to a retaliating agency basically being carte blanche to hold that sort of Damocles over the head of its victim, extract enormous pain, and be effectively unreviewable factually. And then there's one more point I just would like to underscore vis-a-vis the 16 other CID recipients. It is, I think, should be deeply problematic that their whole antitrust theory, and they've never really articulated any coherent theory, is that when folks agree to stop frequenting what they view as socially noxious entities, that that's somehow an antitrust violation. If they're right, the civil rights movement is wrong. And what the Supreme Court said in cases like Claiborne Hardware is that when you agree for a social reason to seek going to a particular business, that's not an antitrust violation. The fact that my friend's on their side, you don't have to make that determination today. It would be very clear. You've got FTC versus trial lawyers on the other side of that. But trial lawyers underscore Judge Katz's why what they're doing has no coherent legal basis because they're saying here— They can unilaterally choose not to associate with Twitter, with X, because they don't like the advertising. That's fine, 100 percent, but they can't agree. If competitors agree to boycott, that's an antitrust violation. No, actually, Judge Katz, I want to underscore. You don't have to decide any of this today, but I think it's clear as day that that's actually not Claiborne Hardware. In Claiborne Hardware, you have a bunch of customers who are saying we're not going to go to a segregationist business because they're segregationists. What Claiborne Hardware says is that's protected First Amendment activity. In trial lawyers, you have a bunch of trial lawyers who want to increase their wages. And so they say you can't do that because that's not for a social purpose. That's for the express purpose of increasing your wages. And what's happening here is Chairman Ferguson has said he is doing this because he wants different types of speech. He wants to make X the platform that has social cohesion, a free marketplace of ideas, and he wants to rebalance the criteria of ideas that are there. The fact that the FTC hasn't provided you any plausible theory why this doesn't run straight into Claiborne Hardware already, I think, should give you deep pause, Judge Millett, to their point, well, that there are 16 other CID recipients out here. And the facts of this case, again, as they come to this court, we don't even know who those other CID recipients are with the exception of two because those are the only two ones who the FTC, because of the petition and quash process, has made public. So we don't even know really. I mean there's been some public reporting speculating as to who the others are, but we don't even know if Media Matters looks anything like those other recipients. You talked a little about limiting principles, and you say, well, don't worry because the record here is extreme. Suppose I agree with that, but still, there's still the question of the limiting principle. Courts in a lot of different contexts worry about the point that bad motive by the government is easy to allege and hard to disprove. And there are lots of areas where there are special legal rules to counteract that. That's why qualified immunity is objective. That's why retaliatory arrest has a special causation rule. It's why selective prosecution has a distinct causation rule. This feels a lot like those kinds of cases. So, Judge Katz, I think there are a couple of points to that. One is just I don't think that my friends on the other side have, again, I think they forfeited on the argument about a different causation standard. But if you take the NEAS standard, it doesn't even map on because the NEAS standard is did you lack probable cause? And it's unique to the context of split-second arrest. That's what the 8th Circuit and the 9th Circuit have both said when they looked at NEAS in a comparable context. They said, no, we're not going to import that here. And my friends on the other side don't even suggest that you should. Take Armstrong's selective prosecution, special causation requirement. My finding has to show that the government would not have prosecuted similarly situated people. So I would point you to Judge Calabresi's decision in the 2nd Circuit, which we've put a citing in our footnote regarding this argument about selective prosecution, which we, again, think is forfeited. But to the extent that you want to address it, Judge Calabresi's footnote explains. It's a footnote in his decision that's cited in our footnote. Judge Calabresi explains that in this First Amendment area, there's very little daylight between a selective prosecution claim and a First Amendment retaliation claim. Because you can say they're retaliating against me from their speech or they're singling me out for my speech. I agree with that, but that's part of my concern. So there's a lot of law that worries about the ease with which a selective prosecution claim can be brought. So I think there are two answers to that. The first is going to be Reisman, actually. Because under Reisman, you're not going to be able to get into court unless you have the kind of here and now injury that media matters can show. So already, Reisman does a lot of work for them in the ordinary case. That was Judge Wilkinson's question earlier, which is, what about the ordinary case? And the answer is, Reisman's generally going to close that unless you have, as this court explained in Paxton, those kind of unique harms. You'll have any target of enforcement that is allied with or made statements favorable to the political party opposed to the one in power. You say, well, we're being targeted because of our abuse. And that type of naked allegation alone is not going to be enough. What you have here is, again, an extraordinary record. You have a years-long campaign started after Media Matters publishes an article detailing that obnoxious content. That triggers Elon Musk's retaliation. It triggers the now deputy White House chief of staff, Stephen Miller, to send out the bad signal. It leads to the two state attorney generals. It then leads the FTC to go over the top. So here you have an extraordinary amount of data. You also have the deeply concerning statements by Chairman Ferguson, where he says, as Judge Millett identified earlier, he's going to go after leftists. He's going to make progressives give up. So you bring the – you go to district court. You bring that claim. You allege the bad motive. Government moves to dismiss. Does that just get litigated under Twombly and Iqbal? Yeah. And that's a sufficient – But under – so a couple of things. One is we're here on a preliminary injunction, so we actually had to show a likelihood of success in the merits. We had to come in to actually get the CID stopped. We had to come in with more, right? We had to come in with actual facts that we had to show to the district court, and the district court made factual findings. So this is not before you on Iqbal Twombly. It's before you want to get a PI on a different standard. But you will – if all you make under Iqbal and Twombly is some kind of conclusory statement, you say, Chairman Ferguson engaged in retaliation, and you don't provide any backup to it, that's classic Iqbal Twombly conclusory statement that gets kicked out at the pleading stage. That's not going to be enough. Here you have a heck of a lot more, right? You've got Chairman Ferguson in that private memo that gets leaked where he wants to become the chair of the FTC. At the time, he's the commissioner of the FTC, and he says, I want to go after leftists. And then publicly he's saying, I want to make progressives give up. Those are not the statements of a neutral prosecutor. And my friends on their side have no answer to the fact that this violates the FTC's rules. The FTC is subject to federal ethics rules which require everybody to remain impartial and to avoid the appearance of impartiality. I can't think of much more that would be partial and at the minimum have the appearance of partiality than those types of statements. No more questions? All right. Thank you. Thank you. We'd ask the uniform. Thank you. Mr. Beyer, we'll give you five minutes. Thank you, Your Honor. I want to correct a couple of misunderstandings apparently about the argument that I presented based on what I heard from my friend on the other side. First of all, the fact that we're seeking information relevant to advertising boycotts, including information that they acknowledge they may have produced in discovery in another litigation against somebody who they say did retaliating, doesn't make our investigation retaliatory. The standard for issuing a CID is does the FTC reasonably believe they have relevant information about advertising boycotts? That's easily satisfied here. We pointed to that one example. It has nothing to do with retaliation. I want to be very clear about that. Secondly, they said, my friend on the other side said, that the exhaustion point should be decided by the district court. The point I was trying to emphasize earlier is that must be decided in a CID enforcement action. That's how the claim channeling framework works. Not in a- What must be decided? The exhaustion question, Judge Katsas. And so when my friend on the other side said they're very confident, for example, that they didn't have to exhaust this claim, this argument, that's a good reason for them to sit back and do nothing and wait for CID enforcement action if one were ever to come, right? That was what you and I were talking about in terms of whether the district court in that action- I'm not sure I'm following this. They don't have to exhaust the exhaustion requirement. No, Your Honor. I'm sorry. Let me step back and see if I can clarify how I think this should work under the framework of this comprehensive scheme, right? You're saying it's really a preservation argument, right? You're saying they have to-whatever they want to argue in court, they have to preserve for the agency. Ordinarily, we think that is the rule. They pointed out there are some exceptions to that rule. Futility may be one. And like it's sort of tautologically true that that being an argument about what can be raised to the district court- In the enforcement- Will be decided by the district court, and then we review it. In that enforcement action. Exactly, Your Honor. And so I think the misunderstanding I wanted to correct is my friend on the other side wants that question to be decided by the district court in the injunction case. And that's not consistent with the framework. That's all I was saying. You want the injunction and then keep exhausting until the FTC decides to bring an action. And then that district court, not the PI district court, is the one who will decide. Yes, it's exhaustion. You've asked us to decide it on a PI, but I guess that means we can't decide it either in your view. You certainly can. It is a matter of your discretion, right? And we made that point. No, I'm confused now. I thought you just said it had to be decided by the court that resolves an FTC enforcement action. I may be misunderstanding. I know you're trying to clarify, so I apologize if my ears are sick here. If it's only to be decided by a court in an FTC enforcement action, I think that's what you said, right? That's where the- That's right. We're not a court in an FTC enforcement action. Right. But the problem is their failure to exhaust is another reason why they have no likelihood of success on the merits. That's what this court must decide, right? That's the framework here in light of the- I thought we couldn't decide on that. It's all part of the claim channeling problem that precludes this action altogether. That's why they have no likelihood of success. I suppose I disagree with you about Thunder Basin. Is there a distinct exhaustion argument that is before us that you want us to consider as an alternative basis for reversal? Yes, Your Honor. But it's because they're closely linked. And that's true from John Doe Company, from Patent, from some of the pre-enforcement challenges that reject-the cases that reject these pre-enforcement challenges. They all say that if that exhaustion requirement that is linked to the channeling, right, that is all part and parcel of why exhaustion is required, right? So I want to make that clear. The concern about sensitive financial information is frequently raised. It is raised in many of those pre-enforcement cases. The FTC treats this information confidentially to prevent disclosure. And I want to emphasize, too, the difference between state and federal CIDs. So the Paxson and Bailey examples are completely irrelevant to the claim channeling framework here. The first-choice SG amicus brief in the Supreme Court that the plaintiffs invoked in their brief explains all this very clearly. I read that. I mean, one significant difference is there are often statutory finality requirements that constrain federal pre-enforcement review. But putting that aside, I'm not sure what the difference is. Unless you think, you know, once upon a time we thought federal courts and federal judges were really, really special. And if you get a federal judge to pass off on something, that's much better than, you know, the Rhode Island state judge in Bannum Books or the Texas state judge in the case we just had. But I don't know that that's how these doctrines work. And Bannum Books is making a substantive point about the First Amendment, which applies to federal enforcement no less than state enforcement. Well, I think one of the reasons that there's a difference here, and this is actually explained in the SG amicus brief, too, is that Congress has enacted a cause of action in Section 1983 against state actors who violate the constitutional rights of a plaintiff. Congress has not done so with respect to federal agencies and, in fact, has enacted statutory schemes like the FTC Act. Which forces them to invoke an implied equitable cause of action, which then just takes us right to irreparable injury. Not just to irreparable injury, Judge Kamsas. It takes us also to doctrines including Armstrong, including Grupo Mexicano, which emphasize the limited scope of equitable relief available based in part on history. And here there is no history of equitable interference with CIDs and subpoenas issued by federal agencies. And going back to your question about state courts versus federal courts for a moment, in terms of the availability of federal court, there's a good reason why Congress enacted Section 1983 to ensure a hearing in a federal court about federal rights. But that hearing is available in this statutory scheme, in the FTC Act, just as it is under other federal agency schemes like the Internal Revenue Code. It's available because there is no legal penalty until a federal court decides these questions, whereas there would be in Paxton and Bailey if a state court were to decide those questions, there would be a legal penalty accruing before a federal court could hear the claims. No, there's no penalty until a judge decides. Correct, Your Honor. That's right. Putting all your weight on the state-federal distinction. I think that does address their significant reliance on Paxton and Bailey in this case. Yeah, absolutely, Your Honor. Last question for me. Are you content to have the merits decided under a just conventional but-for-cause rule, or do you want some special subsidiary rule like the ones for retaliatory arrest or selective prosecution? Your Honor, we think they cannot meet the but-for-causation rule, and therefore the court doesn't need to reach that question. But if it were to reach that question, we think that there are serious concerns with relying solely on allegations, or even evidence at the preliminary injunction stage, of subjective intent alone. And this goes to the point in Hartman and Neves that, you know, government misconduct or state of mind is easy to legend hard to disprove. I agree. I agree with all of that. But if we're just applying but-for-cause, I do think we run into clear error standard of review, which makes this a much tougher case for you. Well, so we think that's not true, but I do want to emphasize that if that's true, then I think this court should address this question about, and should not be the first, actually, to recognize. And what subsidiary rule would you want that they have to show? Yeah, so it would be based. No probable cause? No, it wouldn't be probable cause, Your Honor. Probable cause is relevant, after all, to arrest and prosecution, because that's the objective legal standard, right? Here, we would look at the objective legal standard that governs. The standard from the CID? Issuance of the CID, yes. So that would be reasonable relevance, right? Is there a reason for the FTC to believe that Media Matters might have relevant information about advertising broadcasts? I mean, that's the conceptual simplicity of tracking the issuance standard, but it doesn't leave much of a check for potentially retaliatory actions. I mean, the best reason to believe that a target might possess relevant evidence is not going to be very constraining. Well, it is constraining, but it also has to be understood in the framework of the Sunderbasin channeling scheme in the FTC Act, where, again, no legal penalty accrues until a district court decides on these questions, right? And I think that's ultimately where we come back to the problem with the district court's injunction in this case is the double error. First, you know, misunderstanding, disregarding, and channeling. And second, applying an inadequate, insufficient check at the retaliation substance claim stage, right? Can I just ask one procedural question? Because you said no penalty attaches until it goes before a district court. So assume a situation in this case or otherwise where someone's issued a CID. They go, we don't care. File it over there. FTC brings the enforcement action and wins with a hand down before the district court. Yes, this is reasonable relevance. They haven't done anything. The deadline has long since passed. Does the district court then penalize them for being late, or does that sort of – there's not a penalty then. Then there has to be another opportunity to comply? Exactly. That's what Reisman – You don't have to get a penalty upon the first district court. That's right, Judge Meyers. So that's what Reisman and Claire Fernandes – There's no penalty until the district court rules, but – Until the district court rules. Basically, I think that's right, Judge Meyers. Okay. Yes, so that's what Reisman and Claire Fernandes rest on principally. Let me check. And all of the cases that follow them do the same, right? Thank you, Your Honor. Thank you so much. Oh, did you – So I just want to take issue for a moment with the idea that ideology or sort of partisan statements somehow amount to retaliation. That's not the standard. It's not sufficient to show that a decision-maker – and it's certainly not a violation of the FTC's ethics rules. For a decision-maker who is a political appointee to express political views, that is not sufficient to meet the retaliation standard. And here, nothing that the decision-maker, Chairman Ferguson or Commissioner Holyoke, has ever said – indeed, Commissioner Holyoke has never said anything, apparently, according to media matters relevant to the retaliation claim. Nothing that either of them has said supports their retaliation claim. They rely entirely on the statements of others, and they seek to get essentially a free pass. I don't think that's a fair characterization or argument, but I understand your point about we can't, you know, worry about sort of picking out particular statements. I think it's – the district court here was fundamentally mistaken to attribute the views of others to Chairman Ferguson or Commissioner Holyoke. I think we understand. That's the main concern, Your Honor. That's in your brief, right? Yes, Your Honor. Thank you. We urge the court to reverse and vacate the injunction. Thank you to both counsel. The case is submitted.
judges: Millett; Wilkins; Katsas